# United States Court of Appeals

*for the*

# Eleventh Circuit

VARIOUS INSURERS, REINSURERS AND RETROCESSIONAIRES,

*Plaintiffs-Appellants,*

– v. –

GENERAL ELECTRIC INTERNATIONAL, INC., *et al.*,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION,
DISTRICT COURT CASE NO. 1:21-CV-04751-VMC

## BRIEF OF APPELLEES

KURT W. HANSSON
JAMES L. FERGUSON
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000

WILLIAM K WHITNER
ERIC D. STOLZE
PAUL HASTINGS LLP
1170 Peachtree Street, NE, Suite 100
Atlanta, Georgia 30309
(404) 815-2400

STEPHEN B. KINNAIRD
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC 20026
(202) 551-1700

*Attorneys for Appellees General Electric International, Inc., General Electric
Company, GE Power Services Engineering, and GE Power*

Docket No. 23-11211
*Various Insurers, Reinsurers and Retrocessionaires v.*
*General Electric Int'l, Inc., et al.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1, Appellees General Electric International, Inc., General Electric Company, GE Power Services Engineering, and GE Power submit the following certificate of interested persons and corporate disclosure statement:

- Abu Dhabi National Insurance Company PJSC (Ticker - ADX:ADNIC) – Appellant

- ACE American Insurance Company – Appellant

- Aegis Managing Agency Limited – Managing Agent of Appellant  Certain Underwriters at Syndicate No. 1225 for the 2019 year of account

- African Reinsurance Corporation – Appellant

- Agency Partners Limited – Managing Agent of Appellant Certain Underwriters at Lloyd's, underwriting through Lloyd's Syndicate No. 2791 for the 2019 year of account

- AIG MEA Limited – Appellant

- Algerian Utilities International Ltd. – Majority owner of Shariket Kahraba Hadjret En Nouss S.p.A.  Algerian Utilities International Ltd. is 51% owned by SNC-Lavalin Constructeurs International Inc., and 49% owned by Mubadala Development Company, which is an investment and development

Docket No. 23-11211
*Various Insurers, Reinsurers and Retrocessionaires v.
General Electric Int'l, Inc., et al.*

vehicle established and wholly owned by the Government of the Emirate of Abu Dhabi.

- American International Group, Inc. (Ticker - NYSE:AIG) – Ultimate Beneficial Owner of Talbot Underwriting Ltd and Appellant AIG MEA Limited

- AtkinsRéalis (Ticker - TSX: ATRL; OTC Pink: SNCAF) – As of September 13, 2023, the new name of SNC-Lavalin Group Inc., and parent company of SNC-Lavalin Constructeurs International Inc.

- AXA SA (Ticker - OTCMKTS:AXAHY) – Ultimate Beneficial Owner of Appellant XL Insurance Company

- Associated Electric & Gas Insurance Services Limited – Ultimate Beneficial Owner of Aegis Managing Agency Limited

- Berkshire Hathaway Inc. (Ticker - NYSE:BRK.A) – Ultimate Beneficial Owner of Appellant Berkshire Hathaway International Insurance Limited

- Berkshire Hathaway International Insurance Limited – Appellant

- Calvert, Victoria Marie – United States District Judge

- Carroll, Christopher R. – Counsel for Appellants

- Certain Underwriters at Lloyd's, underwriting through Lloyd's Syndicate No. 0033 for the 2019 year of account – Appellant

Docket No. 23-11211
*Various Insurers, Reinsurers and Retrocessionaires v.*
*General Electric Int'l, Inc., et al.*

- Certain Underwriters at Lloyd's, underwriting through Lloyd's Syndicate No. 0623 for the 2019 year of account – Appellant

- Certain Underwriters at Lloyd's, underwriting through Lloyd's Syndicate No. 1084 for the 2019 year of account – Appellant

- Certain Underwriters at Lloyd's, underwriting through Lloyd's Syndicate No. 1183 for the 2019 year of account – Appellant

- Certain Underwriters at Lloyd's, underwriting through Lloyd's Syndicate No. 1221 for the 2019 year of account – Appellant

- Certain Underwriters at Lloyd's, underwriting through Lloyd's Syndicate No. 1225 for the 2019 year of account – Appellant

- Certain Underwriters at Lloyd's, underwriting through Lloyd's Syndicate No. 2001 for the 2019 year of account – Appellant

- Certain Underwriters at Lloyd's, underwriting through Lloyd's Syndicate No. 2121 for the 2019 year of account – Appellant

- Certain Underwriters at Lloyd's, underwriting through Lloyd's Syndicate No. 2791 for the 2019 year of account – Appellant

- China Investment Corporation – Ultimate Beneficial Owner of Chaucer Syndicates Limited

Docket No. 23-11211
*Various Insurers, Reinsurers and Retrocessionaires v.*
*General Electric Int'l, Inc., et al.*

- Chaucer Syndicates Limited – Managing Agent of Appellant Certain Underwriters at Lloyd's, underwriting through Lloyd's Syndicate No. 1084 for the 2019 year of account

- Chubb Limited (Ticker - NYSE:CB) – Ultimate Beneficial Owner of Appellant ACE American Insurance Company

- Ferguson, James L. – Counsel for Appellees

- Fields Howell LLP – Law firm representing Appellants

- GE Power – Appellee

- GE Power Services Engineering – Appellee

- General Electric Company (Ticker - NYSE:GE) – Appellee

- General Electric International, Inc. – Appellee

- General Insurance Corporation of India (Ticker - BSE:540755, NSE:GICRE) – Ultimate Beneficial Owner of Appellant GIC Re South Africa Limited

- GIC Re South Africa Limited – Appellant

- Gossett, Brandon R. – Counsel for Appellant

- Hannover Re SE (Ticker - OTCMKTS:HVRRY) – Appellant

Docket No. 23-11211
*Various Insurers, Reinsurers and Retrocessionaires v.
General Electric Int'l, Inc., et al.*

- Hannover Rück SE (Ticker - OTCMKTS:HVRRY) – Ultimate Beneficial Owner of Appellant Certain Underwriters at Lloyd's, underwriting through Lloyd's Syndicate No. 2121 for the 2019 year of account

- Hansson, Kurt W. – Counsel for Appellees

- Hartford Underwriting Agency Limited – Managing Agent of Appellant Certain Underwriters at Lloyd's, underwriting through Lloyd's Syndicate No. 1221 for the 2019 year of account

- HDI Haftpflichtverband der Deutschen Industrie V.a.G. – Non-Profit Association Exercising Ownership of Hannover Rück SE and HDI Global SE

- HDI Global SE – Appellant

- Hiscox Syndicates Limited – Managing Agent of Appellant Certain Underwriters at Lloyd's, underwriting through Lloyd's Syndicate No. 0033 for the 2019 year of account

- Hiscox Ltd (Ticker - OCTMKTS:HCXLY) – Parent of Hiscox Syndicates Limited

- Kaufman, Thomas C. – Counsel for Appellants

- Kennedys CMK LLP – Law firm representing Appellants

- Kinnaird, Stephen B. – Counsel for Appellees

Docket No. 23-11211
*Various Insurers, Reinsurers and Retrocessionaires v.
General Electric Int'l, Inc., et al.*

- Kramer, Jonathan D. – Counsel for Appellants

- Map Equity Limited – Ultimate Beneficial Owner of Agency Partners Limited

- Mapfre Re, Compania De Reaseguros, S.A. – Appellant

- Mapfre S.A. (Ticker - OTCMKTS:MPFRY) – Ultimate Beneficial Owner of Appellant Mapfre Re, Compania De Reaseguros, S.A.

- MS Amlin Corporate Member Limited – Corporate Member of Appellant Certain Underwriters at Lloyd's, underwriting through Lloyd's Syndicate No. 2001 for the 2019 year of account

- MS&AD Insurance Group Holdings, Inc. (Ticker - OTCMKTS:MSADY) – Ultimate Beneficial Owner of MS Amlin Corporate Member Limited

- Partner Reinsurance Europe SE – Appellant

- PartnerRe Ltd (Ticker - NYSE:PRE-J) – Ultimate Beneficial Owner of Appellant Partner Reinsurance Europe SE

- Paul Hastings LLP – Law firm representing Appellees

- SCOR SE (Ticker - OTCMKTS:SCRYY) – Ultimate Beneficial Owner of Appellant SCOR UK Company Limited

- SCOR UK Company Limited. – Appellant

Docket No. 23-11211
*Various Insurers, Reinsurers and Retrocessionaires v.*
*General Electric Int'l, Inc., et al.*

- Shariket Kahraba Hadjret En Nouss S.p.A. – Subrogor of Appellants. 51% owned by Algerian Utilities International Ltd., and 49% owned by three subsidiaries of the Government of Algeria: Sonatrach, Sonelgaz and Algerian Energy Company.

- SNC-Lavalin Constructeurs International Inc. – Contracting party with Appellees, and majority owner of Algerian Utilities International Ltd. SNC-Lavalin Constructeurs International Inc. is a subsidiary of AtkinsRéalis, f/k/a SNC-Lavalin Group Inc.

- SNC-Lavalin Group Inc. (Ticker - TSX: ATRL; OTC Pink: SNCAF) – Former name of SNC-Lavalin Constructeurs International Inc.'s parent company. As of September 13, 2023, SNC-Lavalin Group Inc. rebranded as AtkinsRéalis.

- Stolze, Eric D. – Counsel for Appellees

- Talbot Underwriting Ltd – Managing Agent of Appellant Certain Underwriters at Lloyd's, underwriting through Lloyd's Syndicate No. 1183 for the 2019 year of account

- The Hartford Financial Services Group, Inc. (Ticker - NYSE:HIG) – Ultimate Beneficial Owner of Hartford Underwriting Agency Limited

Docket No. 23-11211
*Various Insurers, Reinsurers and Retrocessionaires v.*
*General Electric Int'l, Inc., et al.*

- The New India Assurance Company Limited (Ticker - NSE:NIACL) – Appellant

- Tricarico, Michael J. – Counsel for Appellants

- Whitner, William K. – Counsel for Appellees

- XL Insurance Company SE – Appellant

- Zurich Insurance Group Ltd (Ticker - OTCMKTS:ZURVY) – Ultimate Beneficial Owner of Appellant Zurich Insurance plc

- Zurich Insurance plc – Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to 11th Cir. R. 28-1(c), Appellees General Electric International, Inc., General Electric Company, GE Power Services Engineering, and GE Power request oral argument. Although the issues presented on this appeal are straightforward, Appellants complicate the matter through their reliance on factually and legally irrelevant out-of-circuit and state case law. Oral argument will assist in underscoring the straightforward reasoning and authority governing non-signatory doctrines that must lead to affirming the Order being appealed.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ....................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

TABLE OF CONTENTS................................................................ ii

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF SUBJECT MATTER AND APPELLATE
JURISDICTION .............................................................................ix

STATEMENT OF THE ISSUES...........................................................1

STATEMENT OF THE CASE..............................................................2

STANDARD OF REVIEW .................................................................12

SUMMARY OF THE ARGUMENT ....................................................13

ARGUMENT AND CITATIONS OF AUTHORITY ...........................................16

I.    DISTRICT COURT CORRECTLY HELD IT COULD COMPEL
      APPELLANTS TO ARBITRATE PURSUANT TO CHAPTER
      TWO OF THE FEDERAL ARBITRATION ACT ......................................16

II.   DISTRICT COURT CORRECTLY FOUND SKH IS A
      THIRD-PARTY BENEFICIARY TO THE SERVICES CONTRACT,
      THEREFORE REQUIRING APPELLANTS TO ARBITRATE
      THEIR CLAIMS .......................................................................19

      A.    Appellants' Arguments Regarding How the District Court
            Erred Are Either Contrary to Law or Ignore the Facts ......................22

            1.    SKH Was an Intended Beneficiary of the Contracts, and
                  Appellants' Claim SKH Was Merely an "Incidental
                  Beneficiary" Is Not Supported by the Facts or Law.................23

2.      Whether an Entity Is a Third-Party Beneficiary of a
        Contract Is Not Determined by Whether the Entity
        Pursues Present Day Claims in Litigation Based on
        Specific Contractual Provisions .................................................30

3.      Appellants Cannot Avoid Arbitration by Casting Their
        Claims in Tort and Statute When Their Claims Rely on
        Contracts to Which SKH Is a Third-Party Beneficiary ............35

III.    ALTERNATIVELY, APPELLANTS ARE REQUIRED TO
        ARBITRATE BECAUSE SKH IS EQUITABLY ESTOPPED
        FROM DENYING THE CONTRACTS' ARBITRATION
        PROVISIONS ...............................................................................44

IV.     ALTERNATIVELY, APPELLEES MAY INVOKE THE O&M
        ARBITRATION PROVISION BETWEEN SKH AND SNC
        PURSUANT TO THE DOCTRINE OF EQUITABLE ESTOPPEL............49

CONCLUSION ...................................................................................55

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
        LIMITATION, TYPEFACE REQUIREMENTS AND TYPE
        STYLE REQUIREMENTS ..........................................................57

**Page(s)**

**Cases**

*Alstom Brasil Energia E. Transporte Ltda. v. Mitsui Sumitomo*
    *Seguros S.A.*,
    No. 15 Civ. 8221 (AKH), 2016 WL 3476430
    (S.D.N.Y. June 20, 2016)........................................................................37

*Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*,
    170 F.3d 349 (2d Cir. 1999) ................................................................45

*American Personality Photos, LLC v. Mason*
    589 F. Supp. 2d 1325 (S.D. Fla. 2008) ................................................16

*Axis Specialty Ins. Co. v. Doty-Moore Tower Servs., LLC*,
    No. 1:06-CV-0261-JEC, 2008 WL 11335004
    (N.D. Ga. Sept. 22, 2008) ....................................................................19

*Bahamas Sales Associate, LLC v. Byers*,
    701 F.3d 1335 (11th Cir. 2012) ......................................................47, 48

\*Bautista v. Star Cruises*,
    396 F.3d 1289 (11th Cir. 2005) ..............................................12, 16, 17

\*Blinco v. Green Tree Servicing LLC*,
    400 F.3d 1308 (11th Cir. 2005) ......................................................16, 45

*Bonanni Ship Supply, Inc. v. United States*,
    959 F.2d 1558 (11th Cir. 1992) ...........................................................16

*Carson v. Home Depot, Inc.*,
    No. 1:21-cv-4715, 2022 WL 2954327 (N.D. Ga. July 26, 2022)........47

*Edwards v. Wis. Pharmacal Co., LLC*,
    987 F. Supp. 2d 1340 (N.D. Ga. 2013)................................................40

*E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin
    Intermediates, S.A.S.,*
    269 F.3d 187 (3d Cir. 2001) ........................................................33, 34

*Garcia v. Church of Scientology Flag Serv. Org., Inc.,*
    No. 18-13452, 2021 WL 5074465 (11th Cir. Nov. 2, 2021) .............12

\*GE Energy Power Conversion SAS Corp. v.
    Outokumpu Stainless USA, LLC,*
    140 S. Ct. 1637 (2020) ...................................................................18

*Gill v. Blue Bird Body Co.,*
    147 F. App'x 807 (11th Cir. 2005) ..................................................40

*Greene v. Peloton Interactive Inc.,*
    566 F. Supp. 3d 1299, 1303 (N.D. Fla. 2021) ............................. 33-35

*Grigson v. Creative Artists Agency, L.L.C.,*
    210 F.3d 524 (5th Cir. 2000) ..........................................................45

\*Heath v. Carson Smithfield LLC,*
    No. 3:17-cv-129-TCB, 2018 WL 4846532
    (N.D. Ga. Jan. 3, 2018) ......................................................... 43, 49-51

*Hellenic Inv. Fund, Inc. v. Det Norske Veritas,*
    464 F.3d 514 (5th Cir. 2006) ..........................................................45

*Hines v. Mercedes-Benz USA, LLC,*
    358 F. Supp. 2d 1222 (N.D. Ga. 2005)............................................41

*Hogan v. SPAR Grp., Inc.,*
    914 F.3d 34 (1st Cir. 2019)........................................................ 27-30

\*In re Humana Inc. Managed Care Litig.,*
    285 F.3d 971 (11th Cir. 2002) ............................................ 44-46, 48

*Industrial Electronics Corp. of Wisconsin v. iPower Distribution
    Group, Inc.,*
    215 F.3d 677 (7th Cir. 2000) ....................................................33, 34

*Interested Underwriters at Lloyd's v. M/T San Sebastian*,
  508 F. Supp. 2d 1243 (N.D. Ga. 2007) ............................................................19

*Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*,
  704 F.3d 927 (11th Cir. 2013) ...................................................................24, 32

*InterGen N.V. v. Grina*,
  344 F.3d 134 (1st Cir. 2003) ......................................................................27, 28

*Invista S.A.R.L. v. Rhodia, S.A.*,
  625 F.3d 75 (3d Cir. 2010) ...............................................................................44

*Klamath Water Users Protective Ass'n v. Patterson*,
  204 F.3d 1206 (9th Cir. 1999) .........................................................................24

*McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co*,
  741 F.2d 342 (11th Cir. 1984) ....................................................................36, 37

*Monticello v. Winnebago Indus., Inc.*,
  369 F. Supp. 2d 1350 (N.D. Ga. 2005) .............................................................40

*Morgan v. Dick's Sporting Goods, Inc.*,
  359 F. Supp. 3d 1283 (N.D. Ga. 2019).............................................................40

*Mr. Appliance Corp. v. Holloway*,
  No. 09-AR-1137-S, 2009 WL 10703675 (N.D. Ala. Oct. 30, 2009) ................43

*\*MS Dealer Serv. Corp. v. Franklin*,
  177 F.3d 942 (11th Cir. 1999) ....................................... 16, 18, 19, 31-33, 37, 43

*\*Noble Drilling Servs., Inc. v. Certex USA, Inc.*,
  620 F.3d 469 (5th Cir. 2010) .........................................................33, 44, 45, 47

*Northrop & Johnson Yachts-Ships, Inc. v.
  Royal Van Lent Shipyard, B.V.*,
  855 F. App'x 468 (11th Cir. 2021).....................................................................12

*Olsher Metals Corp. v. Olsher*,
  No. 01-3212-CIV, 2003 WL 25600635 (S.D. Fla. Mar. 26, 2003)...................36

*Olsher Metals Corp. v. Olsher*,
  No. 03-12184, 2004 WL 5394012 (11th Cir. Jan. 26, 2004) ......................18, 19

*Ouadani v. TF Final Mile LLC*,
  876 F.3d 31 (1st Cir. 2017)...............................................................................31

*Outokumpu Stainless USA, LLC v. Converteam SAS*,
  902 F.3d 1316 (11th Cir. 2018) ........................................................................52

*Outokumpu Stainless USA, LLC v. Coverteam SAS*,
  No. 17-10944, 2022 WL 2643936 (11th Cir. July 8, 2022) .............19, 42, 52, 53

*Paul v. Ingersoll-Rand Co.*,
  No. 1:10-CV-00708-JOF, 2011 WL 13269791
  (N.D. Ga. Jan. 14, 2011) ...................................................................................40

*Ragone v. Atl. Video at the Manhattan Ctr.*,
  595 F.3d 115 (2d Cir. 2010) ........................................................................50, 51

*Simmons Hous., Inc. v. Shelton ex rel. Shelton*,
  36 So. 3d 1283 (Miss. 2010)..............................................................................47

*State of Mont. v. United States*,
  124 F.3d 1269 (Fed. Cir. 1997) ...................................................................23, 24

*Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*,
  10 F.3d 753 (11th Cir. 1993) .............................................................................37

*Young v. Grand Canyon Univ., Inc.*,
  57 F.4th 861 (11th Cir. 2023) ............................................................................18

**Statutes**

9 U.S.C.

  Ch. 1 & 2 ...........................................................................................................17
  §201 ...................................................................................................................17
  §202 ...................................................................................................................17
  §203 ...................................................................................................................ix
  §205 .............................................................................................................ix, 17
  §206 ...................................................................................................................17

O.C.G.A. §11-2-313 ................................................................41

**Other Authorities**

Adnan Amkhan, *The Concept of Fault in the Arab Law of Contract,*
9 ARAB LAW QUARTERLY 171 (1994) ...............................................43

Restatement (Second) of Contracts (1981)

   § 302 ...............................................................................23
   § 315 ...............................................................................32

Supplemental Brief of Appellant, *Outokumpu Stainless USA, LLC v. Coverteam SAS*, No. 17-10944 (11th Cir. Aug. 28, 2020), Dkt. 110 .................53

Supplemental Response Brief of Appellee, *Outokumpu Stainless USA, LLC v. Coverteam SAS*, No. 17-10944, (11th Cir. Sept. 11, 2020), Dkt. 117 ...............................................................................53

Complaint, *Various Insurers v. Gen. Elec. Int'l, Inc.*, 1:21-cv-04303-MHC (N.D. Ga. Oct. 14, 2021), Dkt. 1 .............................................8

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

Following Appellants' filing of their opening brief, this Court issued an order finding both subject matter and appellate jurisdiction. 11th Cir. Dkt. 23-2. Appellees General Electric International, Inc., General Electric Company, GE Power Services Engineering, and GE Power agree with this Court's order that subject matter jurisdiction exists under 9 U.S.C. §§ 203, 205, as this matter concerns compelling Appellants to arbitrate their claims pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. Appellees reserve all rights regarding the portion of this Court's order holding the District Court's order is a final decision.

# STATEMENT OF THE ISSUES

Did the District Court correctly compel Appellants, acting as subrogees to SKH—the owner of the Power Plant—to arbitrate their dispute with Appellees on the ground that SKH is a third-party beneficiary of the Services Contract, under which Appellees provided, installed, and, for years, serviced and maintained machinery and components at SKH's Power Plant for SKH's benefit?

Respectfully, the District Court reached the correct holding by concluding SKH received intentional and enforceable benefits from the Services Contract. Appellees not only serviced and maintained the machinery at SKH's Power Plant exclusively pursuant to the Services Contract, but the Services Contract additionally provided explicit legal rights and benefits to SKH. Moreover, Appellants' claims all arise from the Services Contract (and other Contracts), as Appellants rely on representations and seek to recover under warranties that were only made by Appellees to non-party and signatory SNC pursuant to the Services Contract. Appellants cannot both rely on the Services Contract while simultaneously rejecting its arbitration provision. The District Court's Order should be affirmed.

## <u>STATEMENT OF THE CASE</u>

This dispute concerns the Hadjret En Nouss Power Plant located in Tipaza, Algeria (the "Power Plant"). Dkt. 18 ¶1. The Power Plant is owned by Shariket Kahraba Hadjret En Nouss, S.p.A. ("SKH"). *Id.* ¶¶2, 42. SKH is majority owned by SNC-Lavalin Constructeurs International Inc. ("SNC"). Dkt. 29 at 3-4; *see also id.* at 4 (District Court's diagram of relationships, adapted *infra* at 6). SNC built the Power Plant for SKH. Dkt. 18 ¶43. Following the Power Plant's construction, SNC serves as the operator of the Power Plant. *Id.* ¶44. SNC's operation of the Power Plant is governed by an Operation and Maintenance Contract entered into between SKH and SNC on or about July 15, 2006 (the "O&M Contract"). *Id.*; Dkt. 21-8.

In simple terms, the Power Plant burns gas causing large turbine blades to rotate at speed, thereby generating electricity. This is accomplished through the use of gas turbines and their respective packages ("Power Train Sets"), a component of which are the blades that rotate. Dkt. 18 ¶¶45-47. The blades within the Power Plant at issue in this dispute are "S1Bs" (the "Blades"). *Id.* ¶¶49, 89.

As constructor and operator of the Power Plant pursuant to the O&M Contract, SNC entered into several contracts with one or both of General Electric International, Inc. ("GEII"), and General Electric Company ("GEC").[1] *See*

---

[1] No contracts were entered into with either GE Power Services Engineering ("GE PSE") or GE Power (together with GEII, GEC, and GE PSE, the "Appellees") as

Dkts. 21-3, 21-4, 21-5, 21-6; Dkt. 21-8 §26. These contracts concerned the acquisition, installation, maintenance, and servicing of the Power Train Sets, including the Blades. Central to this dispute, all of the contracts entered into amongst SNC, GEII, and GEC require all disputes be submitted to arbitration.

First, on June 30, 2006, both SNC and GEC signed the "Supply Contract" for the purchase of the Power Train Sets, *see* Dkt. 21-4 at Signature Page, in which the parties agreed to arbitrate any disputes arising out of the Supply Contract:

> The Parties hereto agree to attempt to settle any dispute or any claim arising out of the implementation or performance of the [Supply] Contract or related thereto (the "Disputes") without delay, fairly, and in good faith.
>
> In the event that the Dispute is not settled…, the Dispute shall be submitted to the arbitration procedure as per the provisions of Article 18.5 of this Contract…

*Id.* §§18.2(A), (C), 18.5 (the "Supply Arbitration Provision").

Second, on or around September 2006, both GEII and SNC signed the "Services Contract," *see* Dkt. 21-3 at Signature Page, for GEII to perform periodic maintenance services and replacement of components of the Power Train Sets at SKH's Power Plant. *Id.* §1.35 & Signature Page; Dkt. 18 ¶¶18, 54-55. The Services Contract requires any disputes arising from or concerning it to be arbitrated:

---

neither is a legal entity, rather they are trade names for GEII and/or GEC. Appellants improperly included GE PSE and GE Power as parties in this dispute. Appellees reserve all rights regarding GE PSE and GE Power.

> The Parties agree that any or all disputes arising from this [Services Contract] or concerning it … shall be definitively resolved on the basis of the Conciliation and Arbitration Rules of the International Chamber of Commerce ICC (hereinafter referred to as the "Rules") by three arbitrators appointed by the ICC Court of Arbitration (hereinafter referred to as the "Court of Arbitration") in accordance with these Rules, the decisions of which shall be final and not open to appeal.

Dkt. 21-3 §25.2 (the "Services Arbitration Provision").

Third, on December 15, 2006, both GEII and SNC signed the "Installation Contract," *see* Dkt. 21-5 at Signature Page, for GEII to provide services concerning the installation and start-up of the Power Train Sets, and under which the parties agreed to arbitrate any disputes concerning the Installation Contract:

> Any dispute which cannot be settled by agreement of the Parties shall be submitted to arbitration to be held in Geneva, Switzerland…

*Id.* §6 (the "Installation Arbitration Provision").

Fourth, GEC, GEII, and SNC signed the "Coordination Agreement" (together with the Supply Contract, the Services Contract, and the Installation Contract, the "Contracts"), which also concerned the installation and start-up of the Power Train Sets. The parties agreed to arbitrate any disputes under the Coordination Agreement pursuant to the terms of the Supply Contract:

> …any disputes between [SNC] and any or all of [GEC and GEII] under one or more of this Coordination Agreement or the Contracts shall be resolved pursuant to the provisions of Article 18 of the [Supply Contract].

Dkt. 21-6 §3.10 (the "Coordination Arbitration Provision," and together with the Supply Arbitration Provision, the Services Arbitration Provision, and the Installation Arbitration Provision, the "Contracts' Arbitration Provisions").

In addition to the arbitration provisions in the Contracts and demonstrating the propriety and fairness of requiring arbitration of this dispute, SKH and SNC (Appellees' counterparty in each of the Contracts) separately agreed to arbitrate disputes arising from or in connection with the O&M Contract (pursuant to which the Contracts were entered into and are subcontracts of). Dkt. 21-8 §25. The O&M Contract, which is signed by both SKH and SNC, *see* Dkt. 21-8 at Signature Page, states:

> The Parties agree that any or all disputes arising from this Agreement or concerning it that shall not have been able to be settled in accordance with the provisions of Article 25.1 or 25.2, shall be definitively resolved on the basis of the Conciliation and Arbitration Rules of the International Chamber of Commerce…

*Id.* §25.3 (the "O&M Arbitration Provision").

The District Court created a diagram explaining the relationship and contracts between Appellants, SKH, SNC, and Appellees, which Appellants have supplemented, *e.g.,* with lines reflecting additional connections, below:



*See* Dkt. 29 at 4.

All events relevant to this dispute occurred exclusively as a result of the O&M Contract and the Contracts. *Exclusively* in performance of—and solely because of—

the O&M Contract, SNC is the operator of SKH's Power Plant and had authority to enter into the Contracts with Appellees concerning SKH's Power Plant. *See* Dkt. 21-8. *Exclusively* in performance of—and *solely* because of—the Supply Contract, one or more of the Appellees sold Power Train Sets, including the Blades, to SNC for use at SKH's Power Plant. Dkt. 21-4; *see* Dkt. 29 at 12. *Exclusively* in performance of—and *solely* because of—the Installation Contract, one or more of the Appellees installed the Power Train Sets, including the Blades, at SKH's Power Plant. Dkt. 21-5; *see* Dkt. 29 at 12. Following the installation, *exclusively* in performance of—and *solely* because of—the Services Contract, one or more of the Appellees maintained and replaced the Power Train Sets, including the Blades, at SKH's Power Plant for years. Dkt. 21-3; *see* Dkt. 29 at 12.

This dispute concerns the purported failure on October 14, 2019 of one Blade at the Power Plant (the "Incident"), which was—*solely* because of the Services Contract—replaced and installed by one of the Appellees at the Power Plant in April 2018. Dkt. 18 ¶¶1, 89. As alleged, a failure of the Blade caused a liberation event, resulting in damage to the Power Plant. *Id.* ¶¶79-80. The Amended Complaint alleges this failure was caused by Appellees' design, manufacture, and installation of the Blades. *See Id.* ¶¶1, 54-55; Dkt. 21-3, 21-4, 21-5, 21-6. The "Original Complaint" alleged such failure resulted from "maintenance services" of the Blades under the Services Contract. Dkt. 1-1 ¶56.

The Incident allegedly occurred following the issuance by Appellees of several "technical information letters" ("TILs") and a September 4, 2019 letter sent from "GE Power" to SNC (the "September 4, 2019 Letter") concerning the Power Train Set and Blades. *See* Dkt. 18 ¶¶6-7, 31, 37, 65, 68, 71, 75-79, 82. These TILs and the September 4, 2019 Letter were all issued to SNC by Appellees as part of Appellees' contractual obligations under the Services Contract. *See* Dkt. 27-1 ¶¶3-4; Dkt. 18 ¶75. These TILs and the September 4, 2019 Letter were not sent to SKH. *See id.*

On October 14, 2021, a group of plaintiffs, only identified as insurers, reinsurers and retrocessionaires subscribing to various insurance policies with SKH (the "Appellants"), filed two nearly-identical complaints in Georgia state and federal courts. *See* Dkt. 1-1; Complaint, *Various Insurers v. Gen. Elec. Int'l, Inc.,* 1:21-cv-04303-MHC (N.D. Ga. Oct. 14, 2021), Dkt. 1. Appellants only served Appellees with the state court Original Complaint, which was removed to the U.S. District Court for the Northern District of Georgia, Atlanta Division on November 17, 2021. *See* Dkt. 1. The Original Complaint alleged Appellants, as insurers, reinsurers and retrocessionaires to insurance policies, made payments to SKH in connection with the Incident, *see* Dkt. 1-1 ¶15, and contained seven causes of action against Appellees for (1) negligence, (2) gross negligence, (3) strict products liability, (4) breach of the warranty of merchantability, (5) negligent and/or fraudulent

misrepresentations, (6) violation of Algerian Civil Code Article 124, and (7) violation of Algerian Civil Code Article 140 Bis. *Id*. 1-1 ¶¶88-144. The Original Complaint referenced the TILs and September 4, 2019 Letter, and requested "[e]quitable relief, including … a declaration that [GE] Defendants are *in violation of their respective contractual duties*." *Id*. at 29 (emphasis added). The only contract of Appellees the Original Complaint referenced was the Services Contract. *See generally id*.; *see also id*. ¶¶19, 56.

On June 6, 2022 Appellees filed their Motion to Compel Arbitration or, Alternatively, to Dismiss directed to the Original Complaint (the "Original Motion"), which highlighted the Original Complaint's request for a declaration Appellees violated their contractual duties under the Services Contract. *See* Dkt. 15-1 at 9, 14. In response, Appellants amended their complaint on June 24, 2022. Dkt. 18 (the "Amended Complaint"). The only changes Appellants made were to remove the explicit references to the Services Contract, including the request for declaratory relief. *Id.*; *see also* Appellants' Brief at 11. The Amended Complaint otherwise contained the exact same causes of action and factual allegations. Compare Dkt. 1-1 with Dkt. 18. Appellants also continued to rely on the TILs and September 4, 2019 Letter—all of which were sent only to SNC pursuant to the Services Contract—to make out their claims on behalf of SKH. *See, e.g.*, Dkt. 18 ¶¶6-7, 31, 37, 65, 68, 71, 75-79, 82.

On July 22, 2022, Appellees again moved to compel arbitration or, alternatively, dismiss the Amended Complaint (the "Motion").[2] Dkt. 21. Appellees argued Appellants were required to arbitrate, pursuant to the non-signatory doctrines of third-party beneficiary and equitable estoppel, either pursuant to the Contracts or the O&M Contract—the same arguments Appellees asserted in their Original Motion. *Id.* Appellants opposed the Motion (Dkt. 26), and Appellees filed a reply (Dkt. 27).[3] Without needing oral argument, on March 17, 2023, the District Court issued an order granting Appellees' motion to compel arbitration (the "Order"). Dkt. 29.

While SKH was not a signatory to the Services Contract, the District Court correctly found Appellants are required to arbitrate their claims because SKH is a third-party beneficiary of the Services Contract. Dkt. 29 at 13. The District Court held "the [Appellants'] insured was conferred a benefit as a result of SNC's entry into the Services Contract, and that enforcement of the agreement under a third party beneficiary doctrine is warranted under the facts of this case." Dkt. 29 at 10.

---

[2] On August 16, 2023, the District Court granted the parties' joint motion to stay briefing regarding the portion of the Motion moving to dismiss the Amended Complaint. Dkt. 25. As such, the District Court decided only the portion of the Motion seeking to compel arbitration.

[3] For procedural purposes not relevant to this appeal, on October 4, 2022, Appellees filed their answer to the Amended Complaint. Dkt. 28.

Specifically, the District Court concluded "providing parts for the Power Plant for the benefit of [SKH] was a basic objective of the contract at the time of its formation," and these were "direct tangible benefits" SKH received. *Id.* at 11-12. The District Court did not rule on whether Appellants were also required to arbitrate under the other Contracts or the O&M Contract, or if the non-signatory doctrine of equitable estoppel also required arbitration. *See id.* Finally, the Order deferred to the arbitrator the question of whether Appellants' claims fell within the scope of the Services Arbitration Provision, pursuant to the Rules of Arbitration of the International Chamber of Commerce (the "ICC"), which govern the Services Contract. *See id.* at 14-15; Dkt. 21-3 §25.2.

Following the Order, Appellants did not file an arbitration claim. Instead, on April 13, 2023, Appellants filed a notice of appeal. Dkt. 30. On May 3, 2023, this Court issued jurisdictional questions to the parties, and subsequently ruled it had jurisdiction over this appeal on October 18, 2023. *See* 11th Cir. Dkt. 12, 23. On June 22, 2023, Appellants filed their opening appellate brief ("Appellants' Brief"). 11th Cir. Dkt. 19.

## STANDARD OF REVIEW

On an order granting a motion to compel arbitration, this Court reviews "the district court's factual findings for clear error and legal conclusions *de novo*." *Garcia v. Church of Scientology Flag Serv. Org., Inc.*, No. 18-13452, 2021 WL 5074465, at *4 (11th Cir. Nov. 2, 2021); *see also Northrop & Johnson Yachts-Ships, Inc. v. Royal Van Lent Shipyard, B.V.*, 855 F. App'x 468, 471 n.2 (11th Cir. 2021) ("We review *de novo* a district court's grant of a motion to dismiss and compel arbitration."); *Bautista v. Star Cruises*, 396 F.3d 1289, 1294 (11th Cir. 2005) (same).

# SUMMARY OF THE ARGUMENT

The District Court correctly required Appellants to arbitrate this dispute, because SKH, for whom Appellants are subrogees, is a third party beneficiary of the Services Contract. The third-party beneficiary doctrine applies when the parties to a contract, at the time of its formation, intend to provide benefits upon a third party that confer enforceable rights. The Services Contract, like the other Contracts, conferred intentional and enforceable benefits upon SKH. The entire purpose of the Contracts was to supply, install, service, and maintain the Power Train Sets for years at SKH's Power Plant, for SKH's benefit. Moreover, the Services Contract also contained a variety of benefits that were explicitly given to SKH. Each of these benefits were legally enforceable rights SKH could pursue against either SNC or GEII.

Appellants' arguments for why the District Court erred all fail. First, Appellants claim SKH is merely an incidental beneficiary to the Services Contract. Appellants, however, ignore the concrete and intentional benefits SKH received and the various contractual provisions explicitly conferring legally enforceable rights on SKH.

Second, Appellants argue the analysis for whether an entity is a third-party beneficiary requires the entity to be enforcing specific contractual rights in litigation. Appellants' argument misrepresents and misconstrues the relevant case law. The

determination of whether a non-signatory is a third-party beneficiary of a contract is made at the time of contract formation based upon the intent of the signatories. While relevant to determining if claims fall within the scope of an arbitration provision—an issue left for the arbitrator—the specific rights pursued in present-day litigation are immaterial to whether a party is a third-party beneficiary.

Third, Appellants argue they do not assert any contractual rights against Appellees, but instead only tort and statutory claims, so the third-party beneficiary doctrine cannot apply. However, federal law is clear that parties cannot avoid arbitration by casting their contract-based claims in tort or statute. Here, Appellants' claims are all based in and rely on the Services Contract. For example, Appellants' breach of warranty claim *requires* a contract, and the only warranty issued by Appellees was (as the District Court noted) in the Services Contract. Additionally, the supposed fraudulent representations Appellees made were all directed to SNC— not SKH—pursuant to the Services Contract.

Even if this Court were to hold third-party beneficiary does not apply, the District Court's decision to compel arbitration should still be affirmed, because SKH directly benefitted from the Contracts and Appellants are, therefore, equitably estopped from denying arbitration under them. SKH received the Power Train Sets, had them installed, and had Appellees' service and maintain them for years at SKH's Power Plant. Appellants' claims, while spun in tort and statute, seek to enforce the

Contracts by alleging and relying upon services, representations, warranties, and duties that all only occurred or exist because of the Contracts.

Finally, Appellants' are equitably estopped from denying arbitration pursuant to the O&M Contract, to which SKH is a signatory. A signatory to a contract can be compelled to arbitrate with a non-signatory where the signatory's claims rely on or are intertwined with the contract. SKH entered into the O&M Contract with SNC—SKH's majority owner—so SNC would operate SKH's Power Plant. As part of the O&M Contract, SKH agreed SNC could subcontract out for the work required. Pursuant to its rights and powers under the O&M Contract, SNC entered into the Contracts with Appellees, and SKH reaped the benefits of those Contracts. Through their claims, Appellants seek to step in for SNC, pursuing warranties and allegedly false representations only made by Appellees to SNC. Appellants cannot both claim actions Appellees took with SNC were actions against SKH and at the same time disavow the O&M Contract, under which SNC performed (including through Appellees) for SKH's benefit.

For these reasons, the Order of the District Court should be affirmed and Appellants required to arbitrate this dispute.

## ARGUMENT AND CITATIONS OF AUTHORITY

### I.   DISTRICT COURT CORRECTLY HELD IT COULD COMPEL APPELLANTS TO ARBITRATE PURSUANT TO CHAPTER TWO OF THE FEDERAL ARBITRATION ACT

The District Court correctly held Appellants are required to arbitrate their claims pursuant to the Services Contract.[4]   In deciding a motion to compel arbitration, there is a "strong presumption in favor of arbitration of international commercial disputes," and courts will conduct "a very limited inquiry" into whether the necessary factors are present to compel arbitration.[5]   *Bautista*, 396 F.3d at 1294-95 (citations omitted); *see also MS Dealer Serv. Corp. v. Franklin*, 177 F.3d

---

[4] Because the District Court correctly found Appellants are bound to arbitrate pursuant to the Services Contract, it did not (because it needed not) address the other Contracts or the O&M Contract. *See* Dkt. 29 at 7-8, 10.  In the event this Court finds error in the District Court's conclusion that the Services Contract requires arbitration, this Court can still affirm by holding arbitration is required under any of the other Contracts or the O&M Contract.  *Bonanni Ship Supply, Inc. v. United States*, 959 F.2d 1558, 1561 (11th Cir. 1992) ("[T]his court may affirm the district court where the judgment entered is correct on any legal ground regardless of the grounds addressed, adopted or rejected by the district court.").  As such, Appellees address all Contracts and the O&M Contract in this brief.

[5] Appellants cite *American Personality Photos, LLC v. Mason* for the proposition that in the non-signatory context this Court must be "wary" of requiring arbitration.  Appellants' Brief at 17 (quoting 589 F. Supp. 2d 1325, 1330-31 (S.D. Fla. 2008)).  But *American Personality Photos* addressed New York law and relied upon Second Circuit decisions.  *See* 589 F. Supp. 2d at 1330-31.  That is not the policy in *this Circuit* under federal common law.  *See e.g.*, *MS Dealer*, 177 F.3d at 947; *Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308, 1311 (11th Cir. 2005) (holding equitable estoppel required plaintiff to arbitrate statutory claim, but "first not[ing] the unquestionably strong federal policy favoring arbitration").

942, 947 (11th Cir. 1999), *abrogated on other grounds by Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (noting "liberal federal policy favoring arbitration agreements" when analyzing non-signatory doctrines).

Federal courts recognize and enforce commercial arbitration agreements under the terms of the Federal Arbitration Act (the "FAA"). The FAA separately addresses domestic and international arbitration agreements. *See* 9 U.S.C. Ch. 1 & 2. Chapter 2 of the FAA adopts The Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), under which United States Courts have jurisdiction to enforce mandatory arbitration clauses in international agreements. 9 U.S.C §§201, 202, 205, 206.

While the Convention requires four jurisdictional prerequisites to be met to compel arbitration (*see Bautista*, 396 F.3d at 1294-95 & n.7), the District Court correctly recognized, "[t]he sole issue in this case is the first jurisdictional prerequisite: whether there exists a written agreement to arbitrate."[6] Dkt. 29 at 8; *see* Appellants' Brief at 14-16. A written agreement to arbitrate exists where there is "an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams." *Bautista*, 396 F.3d at 1300

---

[6] To the extent this Court wishes to review the three other jurisdictional prerequisites to arbitration, Appellees respectfully refer this Court to the undisputed sections of Appellees' memorandum of law in support of their motion to compel arbitration. *See* Dkt. 21-1 at 15-16.

(citing Convention, art. II(2)). Non-signatories can be required to arbitrate pursuant to a contract's arbitration clause under domestic non-signatory doctrines, including agency, equitable estoppel, and third-party beneficiary. *See GE Energy Power Conversion SAS Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1648 (2020) ("*Outokumpu II*") (holding domestic non-signatory doctrines can be applied to mandatory arbitration provisions contained in international commercial agreements under the Convention); *MS Dealer*, 177 F.3d at 947 (listing non-signatory doctrines).

Here, the Contracts[7] and the O&M Contract contain written arbitration agreements. *Supra* at 3-5. The only question[8] on appeal is whether the District Court

---

[7] Appellants are required to arbitrate against all Appellees. *See Olsher Metals Corp. v. Olsher*, No. 03-12184, 2004 WL 5394012, at *3 (11th Cir. Jan. 26, 2004) ("*Olsher II*") ("[E]ach of these defendants-whether or not a signatory to the 1994 Agreement-can invoke the arbitration clause in the light of their close relationship to the parties to the agreement"); *see also* Dkt. 21-1 at 14-15. While Appellants disputed this below, the District Court correctly dismissed Appellants' unsupported argument out of hand. Dkt. 29 at 15 n.7. Appellants do not advance this argument on appeal, and it is, therefore, waived. *See generally* Appellants' Brief; *see also Young v. Grand Canyon Univ., Inc.*, 57 F.4th 861, 878 (11th Cir. 2023) ("A party who fails to squarely raise a claim in its brief therefore abandons that claim.").

[8] While the parties disputed below whether Appellants' claims fall within the scope of the arbitration provision, the District Court correctly deferred the issue to the arbitrator. Dkt. 29 at 13-15. Appellants did not argue, nor can they now in reply, that the District Court erred by leaving this question to the arbitrator. *See generally* Appellants' Brief; *see Young*, 57 F.4th at 878.

correctly required Appellants (as subrogees for SKH[9]) to arbitrate under the non-signatory doctrine of third-party beneficiary, and whether, alternatively, the doctrine of equitable estoppel applies. *See* Appellants' Brief at ix.

## II. DISTRICT COURT CORRECTLY FOUND SKH IS A THIRD-PARTY BENEFICIARY TO THE SERVICES CONTRACT, THEREFORE REQUIRING APPELLANTS TO ARBITRATE THEIR CLAIMS

A non-signatory can be compelled to arbitrate when an intention existed at the time the contract containing the arbitration provision was formed that the third party would be a beneficiary of the contract. *Interested Underwriters at Lloyd's v. M/T San Sebastian*, 508 F. Supp. 2d 1243, 1249 (N.D. Ga. 2007).[10] Where a contract affords a third party rights or benefits under its terms, the third party is a beneficiary of the contract. *See MS Dealer*, 177 F.3d at 947 (third-party beneficiary applies

---

[9] As subrogees, Appellants stand in the position of SKH. *See Axis Specialty Ins. Co. v. Doty-Moore Tower Servs., LLC*, No. 1:06-CV-0261-JEC, 2008 WL 11335004, at *4 (N.D. Ga. Sept. 22, 2008). Appellants did not dispute this below. *See* Dkt. 29 at 8 n.3.

[10] Federal common law governs this dispute of enforcing an international arbitration agreement under Chapter 2 of the FAA, and Appellants "do not dispute this unremarkable proposition." Appellants' Brief at 32 n.6; *see Outokumpu Stainless USA, LLC v. Coverteam SAS*, No. 17-10944, 2022 WL 2643936, at *6 (11th Cir. July 8, 2022) ("*Outokumpu III*") (Tjoflat, J., concurring) ("[W]e must apply federal common law in determining whether equitable estoppel applies in New York Convention cases."); *Olsher II*, 2004 WL 5394012, at *2 (affirming "all questions relating to the scope, interpretation, and construction of the arbitration clause will be answered according to federal law").

where "parties to a contract together agree, upon formation of their agreement, to confer certain benefits thereunder upon a third party, affording that third party rights of action against them under the contract") (citation omitted).

The District Court correctly found the Services Contract conferred benefits on SKH. Dkt. 29 at 10-12. At a high level, Appellees continued to service and maintain SKH's Power Train Sets for years after they were installed in accordance with the Services Contract.[11] *See* Dkt. 21-3; Dkt. 29 at 11 ("look[ing] at the language of the Services Contract itself" and concluding "providing parts for the Power Plant for the benefit of [SKH] was a basic objective of the contract at the time of its formation" (citing Dkt. 21-3 at 7, §1.35)). This included Appellees replacing the Blade in question at SKH's Power Plant prior to the Incident pursuant to the Services Contract. Dkt. 18 ¶¶1, 89. As the District Court observed, the relevant products and services SKH's Power Plant received were all undertaken by Appellees exclusively due to the Services Contract. *See* Dkt. 29 at 12. In installing, servicing, and maintaining the Blades at the Power Plant under the Services Contract, SKH directly benefited because it was *SKH's Power Plant* that received GEII's services.

---

[11] Additionally, SKH benefitted from the other Contracts. SKH received the Power Train Sets for its Power Plant due to the Supply Contract, and the Power Train Sets were installed at SKH's Power Plant pursuant to the Installation Contract. *See* Dkts. 21-4, 21-5.

Additionally, the Services Contract (which defines **SKH** as the "**Project Owner**") *explicitly* conferred certain benefits and rights upon SKH—despite not being a signatory. For example, Section 1.57 provides GEII is obligated to comply with performance "changes to the Power Train Set decided upon by either **the Project Owner** or the Operator." Dkt. 21-3 §1.57 (emphasis added). Section 6.14 requires GEII to create and maintain operation and maintenance reports and certificates and provides "[**t]he Project Owner** and the Operator may have access to [them,]" including that GEII "shall provide immediate access to all the documents required in the context of an audit or for drawing up financial reports." *Id.* §6.14. Also, Section 15, which grants and limits certain property rights, explicitly grants ownership and rights over GEII and SNC's property to SKH—a non-signatory:

> The Service Provider agrees that the Operator and/or **the Project Owner**, or their respective subcontractors … shall hold all the property rights, including any patent, copyright, trade secrets, trademark or other intellectual property rights, on any document … that have been supplied by the Operator to the Service Provider pursuant to this Agreement, with the exception of use pursuant to furnishing the Maintenance Services, which usage that shall be authorized free of valuable consideration.
>
> …
>
> Should a document be created, produced, or should an intellectual property right be developed by the Service Provider and/or its staff or subcontractors during the term of this Agreement, said intellectual property shall remain the property of the Service Provider and/or its subcontractors and, subject to the provisions of Article 22 (Confidentiality), shall be used by the Operator and/or **the**

21

> **Project Owner**, free of valuable consideration, pursuant to the operation of the Power Station and for the Term of the Agreement.

*Id.* §15 (emphasis added). Finally, where GEII cannot react to emergency circumstances at the Power Plant, Section 21 entitles "the Operator or **the Project Owner** [to] make any or all decisions without informing [GEII] beforehand, and take any measures that the Operator or **the Project Owner** shall deem to be reasonable and necessary in the light of the circumstances…" *Id.* §21 (emphasis added).

SKH is a third party beneficiary of all of the Contracts, and unquestionably a third party beneficiary of the Services Contract. The Contracts all serve one purpose: to provide benefits, in the form of ownership, installation, maintenance, and servicing of the Power Train Sets, to SKH. *See, e.g.*, Dkt. 29 at 11-12; Dkt. 21-3 at 7, §1.35. The Services Contract also includes explicit contractual terms conferring legally enforceable rights upon SKH. Dkt. 21-3 §§1.57, 6.14, 15, 21. SKH cannot reap the Contacts' benefits and then its insurers disavow arbitration under those very Contracts.

A.  Appellants' Arguments Regarding How the District Court Erred Are Either Contrary to Law or Ignore the Facts

Appellants proffer three arguments for why SKH is not a third-party beneficiary to the Services Contract and, therefore, Appellants are not required to arbitrate their claims. First, Appellants claim SKH is merely an incidental

beneficiary to the Services Contract. Appellants' Brief at 18. Second, Appellants argue the analysis for whether an entity is a third-party beneficiary requires the entity to be enforcing specific contractual rights in litigation. *Id.* at 27-28. Third, Appellants argue they do not assert any contractual rights against Appellees, but instead only tort and statutory claims, so third-party beneficiary cannot apply. *Id.* at 28-30. Each of Appellants' arguments fail.

1. <u>SKH Was an Intended Beneficiary of the Contracts, and Appellants' Claim SKH Was Merely an "Incidental Beneficiary" Is Not Supported by the Facts or Law</u>

Appellants' first argument for why third-party beneficiary does not apply is "SKH is at most an incidental beneficiary to the Services Contract." Appellants' Brief at 18. But, the District Court correctly rejected this contention and looked to the Services Contract to find, rightly, SKH is an intended beneficiary. Dkt. 29 at 10-13.

A beneficiary is an intended, rather than an incidental, beneficiary when the parties to the contract intended to confer a right to performance on the beneficiary and "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." 14 Restatement (Second) of Contracts § 302 (1981); *State of Mont. v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997) ("One way to ascertain such intent is to ask whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him."). The

intention to benefit the third party can be either express or implied in the contract. *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir. 1999), *opinion amended on denial of reh'g*, 203 F.3d 1175 (9th Cir. 2000); *State of Mont.*, 124 F.3d at 1273; *see also Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 932 (11th Cir. 2013) (gathering various federal law cases).

SNC and GEII plainly intended to provide benefits to SKH, which SKH would be reasonable to rely on and believe it received rights to enforce. Looking at the language of the Services Contact, the District Court rightly concluded "providing parts for the Power Plant for the benefit of [SKH] was a basic objective of the contract at the time of its formation." Dkt. 29 at 11. The District Court also identified that the very Power Train Sets at issue were only provided to and maintained by Appellees due to and during the term of the Services Contract (*see id.* at 11-12; *see also* Dkt. 18 ¶89; Dkt. 21-3 at 7, §1.35), and the Services Contract explicitly stated SNC was entering into the Services Contract pursuant to the O&M Contract so Appellees could service the Power Train Sets at *SKH's Power Plant*. *See* Dkt. 29 at 11; *see also* Dkt. 21-3 at 7.

Appellants attempt to dispute the District Court's findings by claiming none of the provisions the District Court cited conferred benefits to SKH, but SKH's claims are disconnected from the Services Contract's text. *See* Appellants' Brief at 20. First, Appellants inexplicitly claim Section 1.35 "does not provide any

indication that the parts are being provided for the benefit of any party other than SNC." *Id*. But, it is unquestioned that the Power Train Sets referred to in Section 1.35 are in SKH's Power Plant, and the Services Contract was entered into so Appellees would "provide Maintenance Services for the Power Train Sets that form part of [SKH's] Power Station." Dkt. 21-3 at 7. The Services Contract as a whole is clear: Appellees were engaged to service and maintain the Power Train Sets at SKH's Power Plant for SKH's benefit. *See, e.g.,* Dkt. 21-3 at 7, §1.35.

Next, while the District Court pointed to the warranty GEII provided under the Services Contract to SNC, Appellants claim SKH did not receive the benefit of the warranty because it expired after one year. *See* Appellants' Brief at 20; Dkt. 29 at 11-12; *see also* Dkt. 21-3 §9.9. But Appellants miss the point. It is not disputed that if the Incident had occurred during the term of the warranty SKH could have sought to recover under the Services Contract's warranty, because the Services Contract was entered into for the benefit of SKH to service the Power Train Sets at its Power Plant. The fact the warranty had expired and the Incident occurred after its term does not mean SKH was not the beneficiary of the warranty while it was active (or that SKH's third-party beneficiary status had any expiration date). Moreover, the warranties in the Contracts are the only warranties Appellees issued regarding the Power Train Sets, so they must be the warranties Appellants sue upon in their breach of warranty claim. *See* Dkt. 18 ¶¶111-17; *infra* at 40-41.

The intent of SNC and Appellees to confer meaningful benefits upon SKH cannot be credibly disputed. SKH did not receive a mere vague, or attenuated benefit. SKH received the Power Train Sets, had the Power Train Sets installed at its Power Plant, and had those Power Train Sets serviced and maintained by Appellees at SKH's Power Plant, all pursuant to the Contracts. Appellees did not provide these services to SKH and its Power Plant for years for no reason— Appellees supplied, installed, serviced, and maintained the Power Trains Sets because of the Contracts and the O&M Contract. Without the Contracts, SKH would not have received those products and services. Moreover, as listed *supra* at 21-22, the Services Contract explicitly gave SKH certain enforceable rights and benefits by its terms, including the use of intellectual property rights free of consideration and the right to direct performance changes to the Power Train Sets that Appellees must comply with. *See, e.g.,* Dkt. 21-3 §§1.57, 6.14, 15, 21. For example, Section 6.14 provided SKH access to documents and Section 15 granted SKH, free of consideration, certain property rights. *Id.* §§6.14, 15. Appellants cannot reasonably argue—and have not argued—that if SKH had been denied or charged for those documents or property rights then SKH could not have asserted those rights under the Services Contact in court. As SNC and GEII intended to confer enforceable rights and benefits on SKH, SKH was an intended third-party beneficiary of the Services Contract.

Rather than address the facts above, Appellants cite two cases from the First Circuit to claim, despite all of these specific and textually-explicit benefits contained within the Contracts, SKH is no more than an "incidental bystander" to the Contracts. First, Appellants assert *InterGen N.V. v. Grina*, 344 F.3d 134 (1st Cir. 2003) is "remarkably on point." Appellants' Brief at 21-22. But the District Court correctly found the case inapposite. *See* Dkt. 29 at 12. In *InterGen*, "[t]here [we]re *no* third-party rights afforded to InterGen," *the non-signatory.* 344 F.3d at 146. InterGen was just "an elder in a corporate family that included both [Rocksavage Power Co. (RPC) and Coryton Energy Co. (CEC)]." *Id.* at 147. There were no allegations either IngerGen owned the developments benefitting from the contracts or work was done on InterGen's property. Instead, "[b]oth … developments were encased in individual Cayman Island corporations, namely, … RPC … CEC." *Id.* at 138. As the District Court noted, *InterGen* simply "involved an allegation that a parent company benefitted from performance of an agreement based on its equity stake." Dkt. 29 at 12. This is in stark contrast to this dispute where SNC, which has a majority interest in SKH, entered into the Contracts so Appellees would provide products and services to *SKH's* Power Plant, and the parties explicitly provided SKH rights under the terms of the Services Contract.

Appellants attempt to bolster the relevance of *InterGen* by relying on another First Circuit decision, *Hogan v. SPAR Grp., Inc.*, 914 F.3d 34 (1st Cir. 2019), which

itself relies upon *InterGen*. Appellants' Brief at 22-25. However, Appellants misrepresent *Hogan*—a case readily distinguishable from this dispute.

In *Hogan*, a retail services provider, SPAR, and a personnel staffing company, SBS, were sued by Hogan, an independent contractor. *Hogan*, 914 F.3d at 36. Hogan entered into an Independent Contractor Master Agreement (the "Agreement") with SBS, under which SBS assigned Hogan to perform work for SPAR. *Id.* The Agreement made no mention of SPAR, but did make a reference to SBS's "customers," of which SPAR was one. *Id.* at 39-40. There was no contract between Hogan and SPAR. *Id.* at 36. Both SPAR and SBS moved to compel Hogan to arbitrate his claims against them, pursuant to the arbitration provision in the Agreement. *Id.* at 37. SPAR, who was a non-signatory, argued it was a third-party beneficiary to the Agreement or Hogan (otherwise) was estopped from avoiding arbitration under the Agreement. *Id.* at 39.

Appellants' misrepresentations of *Hogan* are numerous. First, Appellants claim SPAR and SBS are "two closely affiliated companies," (Appellants' Brief at 23), but the First Circuit was keen to note that while the two were "affiliated," SBS "is not a subsidiary of or controlled by SPAR," and "the Amended Complaint does not specify the exact relationship." *Hogan*, 914 F.3d at 36 & n.1. Second, Appellants entirely misrepresent the First Circuit's opinion, stating in their brief:

> Beyond the fact that the independent contractor agreement
> in *Hogan* provided a direct benefit to SPAR in the form of

> services, the Court acknowledged that the agreement also potentially bestowed upon SPAR, as SBS' customer, explicit rights and benefits, including the right to "dictate certain work requirements to the independent contractor,"

Appellants' Brief at 23 (quoting *Hogan*, 914 F.3d at 39); *see also* Appellants' Brief at 24 (claiming "in *Hogan*, the contract containing the arbitration clause was entered into for the purpose of providing staffing personnel to the non-signatory"). But, the First Circuit never "acknowledged" any of these assertions, especially not that the Agreement "provided a direct benefit to SPAR in the form of services." *See id.* at 23; *Hogan*, 914 F.3d at 39. Rather, these were the assertions made *by SPAR*. *Hogan*, 914 F.3d at 38-39. The First Circuit *actually* concluded the Agreement in *Hogan* made no mention of SPAR, and provided SPAR no enforceable rights. *Id.* Instead, the Agreement only referred to SBS's "customers" generally. *Id.* at 39-40. The only provision in the entire agreement SPAR could point to was a section stating SBS would convey to Hogan his scheduling and assignment requirements, once SBS received such information from SBS's "customers." *Id.* at 39. The First Circuit correctly concluded a general reference to "SBS's customers" was too "tenuous" and "vague," and the provision did not "mention or manifest an intent to confer specific legal rights upon SPAR." *Id.* at 39-40 (cleaned up).

In reviewing the actual holding by the First Circuit, the differences between *Hogan* and this dispute are clear. Unlike the unknown "affiliate" relationship between SPAR and SBS, here SNC has a majority interest in SKH. Dkt. 29 at 4.

Unlike the *Hogan* Agreement that made no reference to SPAR and referred generally to "customers," the Services Contract makes repeated explicit references to SKH. *See, e.g.*, Dkt. 21-3 at 7, §§1.11, 1.57, 6.14, 15, 21. And while the *Hogan* Agreement did not confer any legally enforceable rights upon the "customers," the Services Contract provides SKH numerous benefits, all of which conferred legal rights of action upon SKH against SNC and GEII. *See, e.g., id.* at 7, §§1.35, 1.57, 6.14, 15, 21.[12]

> 2. Whether an Entity Is a Third-Party Beneficiary of a Contract Is Not Determined by Whether the Entity Pursues Present Day Claims in Litigation Based on Specific Contractual Provisions

Appellants next claim they are not required to arbitrate because, even if they are third-party beneficiaries with respect to certain rights they received under the Contracts, they are not third-party beneficiaries in this dispute because they do not seek to assert those "specific rights." Appellants' Brief at 26-28. Appellants' point to *MS Dealer* in formulating what they claim is the test for when the doctrine applies:

---

[12] Appellants make a passing reference to dicta within the *Hogan* opinion regarding the Agreement's arbitration provision. Appellants' Brief at 24. The First Circuit determined, because the Agreement's arbitration provision stated it was limited to disputes "between the Parties," only SBS and Hogan could be required to arbitrate. *Hogan*, 914 F.3d at 40. However, the Services Arbitration Provision is not narrowed to only claims "between the Parties." Dkt. 21-3 §25.2. The dicta in *Hogan* is, therefore, irrelevant. What *Hogan* does demonstrate is the words of the contract matter, and, here, the Services Contract clearly provided SKH with intentional and enforceable rights and benefits, and *did not* narrow the arbitration provision to only SNC and GEII.

"there must be (i) the creation of rights in favor of a third-party under a given contract; and (ii) an action against a contracting party seeking to enforce those rights." *Id.* at 28 (citing *MS Dealer*, 177 F.3d at 947). But this second prong—the crux of Appellants' argument—is contrary to the doctrine and unsupported by law.

First, Appellants' second prong necessitates that a party's status as a third-party beneficiary depends on the claims it brings in the litigation. Case law is clear, however: the analysis of whether a party is a third-party beneficiary to a contract occurs *at the formation of the contract* and not years later in litigation. *See MS Dealer*, 177 F.3d at 947 (a party is made a third-party beneficiary "upon formation of the[] agreement."); *see also Ouadani v. TF Final Mile LLC*, 876 F.3d 31, 39 (1st Cir. 2017) ("While a court considering the application of equitable estoppel includes a focus on the parties' conduct after the execution of the contract, a court analyzing whether the third-party beneficiary doctrine applies looks to the parties' intentions *at the time the contract was executed.*" (emphasis added)).

Second, Appellants' stated "test" is based on a misreading of *MS Dealer.* In *MS Dealer*, this Court established the third-party beneficiary doctrine "arises when the parties to a contract together agree, upon formation of their agreement, to confer certain benefits thereunder upon a third party, <u>affording that third party rights of action against them under the contract</u>." *MS Dealer*, 177 F.3d at 947 (citation omitted) (emphasis added). Appellants latch onto the underlined portion to create

the second prong of their test (Appellants' Brief at 28), but this is not a second requirement the *MS Dealer* court mandated—and, instead, only a modifier to the previous statement. The Court merely states the benefits conferred must be significant enough to afford a party actionable rights, *i.e.* the party cannot simply be an incidental beneficiary. *See MS Dealer*, 177 F.3d at 947; *Interface Kanner, LLC*, 704 F.3d at 933 (noting for a party to overcome presumption that third parties to government contracts are incidental beneficiaries, the party must show the signatories intended it "be permitted to sue to enforce" the agreement); 14 Restatement (Second) of Contracts § 315 (1981) ("An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee."); *see also* Dkt. 29 at 9 ("Plaintiffs essentially conflate the scope and enforceability questions by arguing … '[SKH] must actually be seeking to enforce or assert rights under the contract at issue.'"). *MS Dealer* does not require those exact rights to be sued upon, particularly not where, as here the arbitration provision broadly covers any or all disputes arising from the contract. *See MS Dealer*, 177 F.3d at 947; Dkt. 21-3 §25.2.

Appellants cite three cases to "support" their assertion that determining whether a party is a third-party beneficiary is based on whether that party is suing upon the *specific* provisions it benefits from, rather than simply the contract at large. *See* Appellants' Brief at 30-31. Appellants' cases all are flawed: first, they are

irrelevant because they cite state law and, second, none actually support Appellants' assertion.

From the outset, all three of Appellants' cited cases have a common problem: they all apply various *state* laws. None of the cases address *federal common* law— the latter being the law that "Appellants do not dispute" applies here.[13] Appellants' Brief at 32 n. 6; *see supra* n.10. *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, examines third-party beneficiary under a three-part Delaware law test. 269 F.3d 187, 196 (3d Cir. 2001). In *Industrial Electronics Corp. of Wisconsin v. iPower Distribution Group, Inc.*, the Seventh Circuit addressed third-party beneficiary in the context of Ohio and Wisconsin law, leaving for the district court on remand to determine which applied. 215 F.3d 677, 680 (7th Cir. 2000). And in *Greene v. Peloton Interactive Inc.*, the district court analyzed Florida's state law on third-party beneficiary claims with respect to minor

---

[13] Appellants include a nonsensical footnote that cases applying state law are somehow of persuasive authority to federal common law simply because the decisions come from federal courts. *See* Appellants' Brief at 32 n.6. While other circuits' decisions applying federal common law may be informative to this Court, there is no logic to the assertion a federal court applying Delaware, Wisconsin, Ohio, or Florida law somehow has a bearing on issues of federal common law, particularly when the legal issues are not novel. Federal courts have already created federal common law rules on the third-party beneficiary and equitable estoppel doctrines. *See, e.g.*, *MS Dealer*, 177 F.3d at 947; *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010).

children. 566 F. Supp. 3d 1299, 1303 (N.D. Fla. 2021). These cases, therefore, are irrelevant.

Nevertheless, if this Court were to examine the Delaware, Ohio, Wisconsin, and Florida law cases, none of the cases support Appellants' interpretation of the third-party beneficiary doctrine. *E.I DuPont*, in dicta, relies upon *Industrial Electronics Corp.*, and contrary to Appellants' suggestion, these cases do not require a beneficiary to be suing upon certain specific provisions it benefitted from. Rather, both cases simply require a *general* relationship between the contract as a whole and the claims. *See Indus. Elecs. Corp.*, 215 F.3d at 680-81 ("claim relates not to the franchise agreement [, to which Industrial Electronics was a third party beneficiary,] but to the earlier association agreement, which does not contain an arbitration requirement"); *E.I. DuPont*, 269 F.3d at 197-98 (claims arose not from contract but from misrepresentations made "outside of the Agreement" that "while arguably related to the underlying Agreement, do not relate to any 'third party beneficiary' status created at the inception of the Agreement"). Lastly, *Greene*, which addressed the specific requirement under Florida law to bind a *minor child* to arbitration (*see* 566 F. Supp. 3d at 1304), is similarly flawed. There, Peloton sought to compel arbitration under the terms of service the minor child's father agreed to when signing up for an online membership. *Id.* at 1302, 1305. But the alleged injuries did not occur while "visiting, browsing, or using" this online account, they occurred due to

the separate product purchase of the Peloton equipment, which the record does not indicate included its own arbitration agreement.  *See id.*[14]

Contrary to Appellants' assertions, the determination of whether a party is a third-party beneficiary is made at the time of the contract's formation, and the rights the third party receives must be actionable.  As addressed *supra* 19-22, SKH received various intentional benefits under the Contracts that granted it rights of action under the Contracts.  SKH is, therefore, a third-party beneficiary of the Contracts.

3. <u>Appellants Cannot Avoid Arbitration by Casting Their Claims in Tort and Statute When Their Claims Rely on Contracts to Which SKH Is a Third-Party Beneficiary</u>

Finally, Appellants argue because their Amended Complaint brings tort and statutory claims, they cannot be required to arbitrate as their claims do not rely on the Services Contract to which SKH is a third-party beneficiary.  Appellants Brief at 28-30.  Not only is Appellants' argument irrelevant for this appeal, but it is also contradicted by even an initial review of the Amended Complaint.

As an initial matter and as the District Court correctly held, once it is determined SKH is a third-party beneficiary of the Contracts, it is for the arbitrator

---

[14] Additionally, while the Court in *Greene* cited Florida law for the assertion claims brought in tort, rather than contract, are not subject to arbitration, this is irrelevant here.  *See infra* 36-38 (federal common law does not allow party to avoid arbitration by recasting claims in tort).

to analyze whether Appellants' tort and statutory claims fall within the scope of the Services Arbitration Provision. Dkt. 29 at 13-14. Appellants' argument, while styled as a threshold test of whether a party is a third-party beneficiary in the first instance,[15] is really addressing whether their claims fall within the scope of the arbitration provision. *See* Appellants' Brief at 28-30; Dkt. 29 at 9 ("Plaintiffs essentially conflate the scope and enforceability questions by arguing that 'for either non-signatory doctrine to apply, the non-signatory (here, SKH) must actually be seeking to enforce or assert rights under the contract at issue.'"). Regardless, for the sake of completeness, Appellees address Appellants' tort and statutory argument below.

"It is well established that a party may not avoid broad language in an arbitration clause by attempting to cast its complaint in *tort rather than contract."* *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co,* 741 F.2d 342, 344 (11th Cir. 1984) (emphasis added); *MS Dealer*, 177 F.3d at 948 n.4; *see also Olsher Metals Corp. v. Olsher*, No. 01-3212-CIV, 2003 WL 25600635, at *5 (S.D. Fla. Mar. 26,

---

[15] As explained *supra* at 19-20, third-party beneficiary status is determined at the time of contract formation, not based on the pleadings. Appellants' arguments underscore why. Under Appellants' theory, SKH is not a third-party beneficiary of the Services Contract in this case, because no claims cite the Services Contract. But, if in another case SKH does cite the Services Contract, then it is a third-party beneficiary for that case. In other words, the analysis of third-party beneficiary is no longer about what the signatories intended at the time of contract formation but, instead, based on how the third party elects to plead its case.

2003), *aff'd* 90 F. App'x 383 (11th Cir. 2003) (parties "may not avoid broad language in an arbitration clause by attempting to cast its complaint in tort rather than contract") (citation omitted).

In *McBro*, the Eleventh Circuit required arbitration of "claims[] cast in tort" (negligence and tortious interference) by a contractor against a construction manager, each of which had no privity with each other but executed separate contracts (requiring arbitration) with an intermediary between them—just as SKH and Appellees executed contracts requiring arbitration with SNC. 741 F.2d at 342-43. The "very basis of the contractor's claim against the construction manager" was the "breach[ of] duties and responsibilities assigned it by the … *agreement.*" *Id.* at 344 (emphasis added); *see Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir. 1993) (summarizing *McBro*: the "court noted the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract, and decided that the claims were 'intimately founded in and intertwined with the underlying contract obligations.'"); *see also Alstom Brasil Energia E. Transporte Ltda. v. Mitsui Sumitomo Seguros S.A.*, No. 15 Civ. 8221 (AKH), 2016 WL 3476430, at *5 (S.D.N.Y. June 20, 2016) (insurer/subrogee's "characterization of the contract dispute as a tort is an invention to serve an argument" that "the arbitration clause … was limited to contract disputes"); *MS Dealer*, 177 F.3d at 947-48 (compelling

plaintiff's *fraud and conspiracy claims* be arbitrated). Here, contrary to Appellants' assertions, their tort and statutory claims *are* premised on the Contracts.

First, Appellees' *contractual* obligations and performance are inseparable from the Amended Complaint,[16] and are—transparently—how Appellants will go about attempting to prove their claims. *Every count* of the Amended Complaint rests on what SKH "rel[ied]" on from Appellees, or what Appellees "represented to SKH," Dkt. 18 ¶¶88, 95, 107, 116, 119, 129, 86, 93; *see id.* ¶¶101, 111, 118, 126, 134. But everything SKH allegedly relied on or Appellees allegedly represented to SKH was actually directed to SNC pursuant to the Services Contract. Specifically, Appellants ubiquitously rely on the TILs and the September 4, 2019 Letter to plead their claims—both of which were exclusively sent to SNC, not SKH. *See, e.g., id.* ¶¶6-7, 31, 37, 65, 68, 71, 75-79, 82; *see id.* ¶75; Dkt. 27-1 ¶¶3-4.

Regarding the TILs, Appellants critique the TILs for their timing and substance, *see, e.g.*, Dkt. 18 ¶¶8, 66-70, and they fault Appellees scheduling of an

---

[16] The Original Complaint requested "[e]quitable relief, including … a declaration that [Appellees] are in violation of their respective contractual duties." Dkt. 1-1 at 29. It also asserted jurisdiction in the Georgia State-Wide Business Court (prior to removal) based on alleging "tort contract claims." *Id.* ¶13. Because the only contract of Appellees the Original Complaint referenced was the Services Contract, *see generally id.*; *see also id.* ¶¶19, 56, Appellants could only have been referring to and relying on the Services Contract. Appellants cannot base their entire Original Complaint on the Services Contract, remove the overt references from the Amended Complaint without making any other changes, and then deny the application of the Services Arbitration Provision.

outage at the Power Plant necessary to perform maintenance services pursuant to the Services Contract until "after the point of failure" of the Blades (*id.* ¶¶9-10, 75-76, 78), premised on the TILs' "advice" and other guidance under the Services Contract. These TILs, however, are only available to Appellees' customers, *i.e. SNC,* under services contracts (like the one in this case). *See* Dkt. 27-1 ¶3 (TILs facially were "offered to you by GE in consideration of its ongoing sales and service relationship with your organization," *i.e.*, to SNC under the Services Contract; and "furnished to [GE's] customer solely to assist that customer," *i.e.*, SNC). SKH did not receive these from Appellees, but can only have relied upon them following their receipt by SNC *under the Services Contract*. Appellants also claim "SNC, together with SKH" "complied with" the September 4, 2019 Letter and during such compliance "the liberation event at issue in this litigation occurred." Dkt. 18 ¶¶75-79. But this letter was sent *only to SNC*. Dkt. 18 ¶75 ("SNC received a letter from GE Power"); Dkt. 27-1 ¶4. The very communications Appellants' entire Amended Complaint relies on were only sent by Appellees to SNC because of the Services Contract, and the only reason SNC may have then forwarded those communications on to SKH was because of the O&M Contract. The Amended Complaint never alleges, nor could it, Appellees took any actions at the Power Plant as a result of direct dealings with SKH or separate from the Services Contract or any other contract.

Second, each of Appellants' claims in its Amended Complaint either rely on or are legally required to be based in contract, *i.e.* the Services Contract. The clearest example of Appellants' claims being premised on the Contracts is Appellants' breach of the warranty of merchantability claim. Dkt. 18 ¶¶111-117. This claim *requires* a contract and privity. *See Gill v. Blue Bird Body Co.*, 147 F. App'x 807, 810 (11th Cir. 2005) (implied warranty claim "may be enforced only by the original buyer, who stands in privity of contract with the seller-defendant") (emphasis in original); *Monticello v. Winnebago Indus., Inc.*, 369 F. Supp. 2d 1350, 1361 (N.D. Ga. 2005) ("In Georgia, a warranty of merchantability 'clearly arises out of a contract of sale of goods, [and] can only run to a buyer who is in privity of contract with the seller.'") (citation omitted); *Paul v. Ingersoll-Rand Co.*, No. 1:10-CV-00708-JOF, 2011 WL 13269791, at *1 (N.D. Ga. Jan. 14, 2011). Appellants' warranty claim also asserts within it that "[Appellees] made express and/or implied warranties to SKH." Dkt. 18 ¶112. Any express warranty requires the existence of a warranty and only extends to the parties in privity—it does not extend to the end purchaser. *See Morgan v. Dick's Sporting Goods, Inc.*, 359 F. Supp. 3d 1283, 1292 (N.D. Ga. 2019) ("[I]f a defendant is not the seller to the plaintiff-purchaser, the plaintiff as the ultimate purchaser cannot recover on [an] *express* warranty, if any, arising out of the prior sale by the defendant to the original purchaser.") (citation omitted); *Edwards v. Wis. Pharmacal Co., LLC*, 987 F. Supp. 2d 1340, 1346 (N.D.

Ga. 2013) (dismissing express and implied warranty claims for failing to plead privity); *Hines v. Mercedes-Benz USA, LLC*, 358 F. Supp. 2d 1222, 1227 (N.D. Ga. 2005); O.C.G.A. §11-2-313.  In other words, an express warranty requires a contract. Appellants do not and cannot explain how they can bring a claim of breach of the implied warranty of merchantability or some amorphous express warranty[17] without relying upon a contract, specifically the Contracts.  The only warranties (implied or otherwise) related to the Power Train Sets are the warranties in the Contracts, such as the very warranty the District Court identified.  Dkt. 29 at 11-12.  On this one count alone, Appellants' argument fails on its face: it *must* rely on the Contracts.[18]

Another example of Appellants' claims being premised on Appellees' obligations under the Services Contract is Appellants' "negligence" claim:

> [the GE] Defendants knew … SKH would rely on … their *advice concerning the operation of the gas turbines and [Blades,]* including … *the number of hours the equipment could be run before a risk of failure would materialize.*

Dkt. 18 ¶88 (emphasis added).[19]  The "duty of care" *in tort* is framed by what Appellees allegedly did, and decisions made, in performance of the Services

[17] The Amended Complaint does not allege what this purported express warranty is. *See* Dkt. 18 ¶¶111-117.

[18] This fatal issue was raised in Appellees' Original Motion, but Appellants still maintained this claim in their Amended Complaint.  *See* Dkt. 15-1 at 22-24.

[19] These same allegations are repeated, either verbatim or adapted, in *multiple* causes of action.  For example, see "gross negligence," Dkt. 18 ¶¶96-96; "strict products

Contract, *e.g.*: (i) in selecting "GEN1" Blades to "install[] … in or around April 2018 when such blades were being phased out," *id.* ¶89(i); (ii) "failing to accurately calculate the appropriate number of hours at which the S1Bs could safely be operated before being replaced," a direct reference to the TILs and their revisions, *id.* ¶89; and (iii) "failing to take reasonable corrective actions after issues began arising with the [Blades], and instead permitting the [Blades] to run to a point where they failed," a direct reference to outage scheduling, and technical advice provided via the TILs, *id.* ¶89(iv)). Each of the foregoing only occurred because of the Contracts. In fact, regarding the maintenance, servicing, and wind down of the Blades, Appellees had no duty to perform any of that work for years after the Blades were sold (if at all) *other than because of the Services Contract.*

Finally, the so-called "statutory" claims on which Appellants rely—just two of seven claims—do not operate to exempt this dispute from arbitration (to the extent they are even applicable, or pled adequately). Courts will routinely compel arbitration of statutory claims when they are related to a contract. *See e.g., Outokumpu III*, 2022 WL 2643936, at *1 (compelling arbitration of tort and statutory claims, including negligence, breach of design and construction warranties, breach of implied warranties under Alabama's Commercial Code, and breach of Alabama

---

liability," *id.* ¶¶107-08; "misrepresentations," *id.* ¶¶120-22, 124, and Algerian law claim. *Id.* ¶¶129-130.

extended manufacturer's liability doctrine); *Mr. Appliance Corp. v. Holloway*, No. 09-AR-1137-S, 2009 WL 10703675, at *4 (N.D. Ala. Oct. 30, 2009) (applying federal common law, requiring franchisor to arbitrate *statutory* Lanham Act and *tort* unfair competition and tortious interference claims against entity created by franchisees, who were subject to arbitration); *Heath v. Carson Smithfield LLC*, No. 3:17-cv-129-TCB, 2018 WL 4846532, at *3 (N.D. Ga. Jan. 3, 2018) (compelling arbitration of plaintiff's statutory Telephone Consumer Protection Act claim); *see also MS Dealer*, 177 F.3d at 948. Furthermore, the Algerian statutory claims themselves are still premised in the performance and conduct of Appellees under the Contracts, from which SKH benefitted. Count Six—Algerian statute 124—is viewed as just another form of "tortious liability" premised in "strict liability." *See* Adnan Amkhan, *The Concept of Fault in the Arab Law of Contract,* 9 ARAB LAW QUARTERLY 171, 173, 173 n.10 (1994). This hardly creates an independent "statutory obligation," as Count Three—which references *no statute*—already advances a claim for "Strict Products Liability." Dkt. 18 at 23-24, 27-28. Next, and last, is Count Seven—Algerian statute 140. Appellants seek recovery *solely* for damage to Appellees' products, but these products were only obtained by SKH because Appellees entered into the Contracts with SNC for the benefit of SKH's Power Plant.

Once the facts and claims are analyzed, Appellants' reliance on the Services Contract and other Contracts is plain. All purported duties, representations, and warranties arise from or only exist due to the Contracts to which SKH is a third-party beneficiary. Appellants cannot both seek relief under, and rely on, the Services Contract and simultaneously avoid the Contracts' Arbitration Provisions.

## III. ALTERNATIVELY, APPELLANTS ARE REQUIRED TO ARBITRATE BECAUSE SKH IS EQUITABLY ESTOPPED FROM DENYING THE CONTRACTS' ARBITRATION PROVISIONS

While the District Court did not reach the issue because it did not need to after finding the third-party beneficiary doctrine applies, Appellants are also required to arbitrate under the Contracts pursuant to the non-signatory doctrine of estoppel. As Appellants' cited case explains, "[a] non-signatory can 'embrace' a contract containing an arbitration clause in two ways: (1) by knowingly seeking and obtaining 'direct benefits' from that contract; or (2) by seeking to enforce the terms of that contract or asserting claims that must be determined by reference to that contract." *Noble Drilling*, 620 F.3d at 473 (citation omitted); *see also Invista S.A.R.L. v. Rhodia, S.A.*, 625 F.3d 75, 85 (3d Cir. 2010) ("Estoppel can bind a non-signatory to an arbitration clause when that non-signatory has reaped the benefits of a contract containing an arbitration clause" in order to prevent "a non-signatory from 'cherry-picking' the provision of a contract that it will benefit from." (citation omitted)); *In re Humana Inc. Managed Care Litig.*, 285 F.3d 971, 976 (11th Cir. 2002), *rev'd on*

*other grounds sub nom. PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401 (2003) ("The purpose of [estoppel] is to prevent a plaintiff from, in effect, trying to have his cake and eat it too; that is, from relying on the contract when it works to his advantage by establishing the claim, and repudiating it when it works to his disadvantage by requiring arbitration." (citation and internal alternations omitted)); *Blinco v. Green Tree Servicing, LLC,* 400 F.3d 1308 (11th Cir. 2008).

"In all cases, the lynchpin for equitable estoppel is equity, and the point of applying it to compel arbitration is to prevent a situation that would fly in the face of fairness." *In re Humana Inc.*, 285 F.3d at 976 (cleaned up); *see also Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527-28 (5th Cir. 2000) ("The linchpin for equitable estoppel is equity—fairness."). While Appellees need only show either that SKH received direct benefits from the Contracts or Appellant's claims rely on the Contracts (*Noble Drilling*, 620 F.3d at 473), both apply here.

First, direct benefits estoppel occurs when, as the name suggests, the non-signatory has directly benefitted from the contracts. *See Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 519 (5th Cir. 2006) (applying direct-benefit estoppel to require non-signatory to arbitrate claims "sounding in tort" that relied on ship "assurance[] and classification" services provided under contract requiring arbitration); *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999) (ability to obtain cheaper insurance and sail under country's flag were

"direct benefits" to yacht owners, who were required to arbitrate claims about certification for seaworthiness/regulatory compliance despite defective design/poor construction). SKH received numerous direct benefits under the Contracts, including the possession, installation, maintenance, and servicing of the Power Train Sets at its Power Plant. *See supra* at 19-22.

Second, to establish the non-signatories' claims are related to the contract, a relationship between the claims and the contract containing the arbitration clause is necessary, but the relationship need not be explicit. The claim must merely either "rely upon or presume the existence of an underlying contract." *In re Humana*, 285 F.3d at 976. Here, the Amended Complaint relies upon and presumes the existence of the Contracts, and equity and fairness requires Appellants arbitrate their claims. *See supra* at 38-44 (addressing the myriad of factual assertions and legal necessities by which the Amended Complaint relies upon the Services Contract, including breach of warranty). Under either equitable estoppel avenue, the doctrine applies here.

Despite the fact specific nature of equitable estoppel, Appellants do not address the Original Complaint or the Amended Complaint in their brief. *See* Appellants' Brief at 32-34. Rather, they simply cite to five cases, without any examination, to posit estoppel does not apply. Appellants' cases, however, are all either irrelevant or distinguishable. Appellants cite two cases examining state law

estoppel doctrines. *Carson v. Home Depot, Inc.*, No. 1:21-cv-4715, 2022 WL 2954327, at *3 (N.D. Ga. July 26, 2022) (Georgia law); *Simmons Hous., Inc. v. Shelton ex rel. Shelton*, 36 So. 3d 1283, 1287-88 (Miss. 2010) (Mississippi law). These cases are irrelevant, because, as Appellants concede, federal common law governs here. *See* Appellants' Brief at 32 n.6.

Appellants' three other cases are factually distinguishable. First, In *Noble Drilling*, the plaintiff relied entirely on "pre-purchase representations" made prior to the parties entering into the contracts. 620 F.3d at 471, 474-75. Here, Appellants rely on services and communications made by Appellees *to SNC* (1) after the Services Contract and other Contracts were executed, and (2) were provided by Appellees under the Services Contract and other Contracts (and were provided only because of those Contracts). *See supra* at 6-7, 38-44.

Second, in *Bahamas Sales Associate, LLC v. Byers*, 701 F.3d 1335 (11th Cir. 2012), mortgage lenders tried to avoid the venue provision in a mortgage note by claiming estoppel entitled them to enforce the venue provision in the underlying lot purchase agreement, to which they were not a signatory. This Court, in dicta, held estoppel did not apply because Byers' appraisal fraud claim concerned the lenders' appraisal for the mortgage—not the purchase of the lot—and Byers only sought relief under the mortgage note (revocation of the mortgage and restitution for prior payments). *Id.* at 1344. Moreover, both the lenders and Byers were signatories to

the mortgage note, so it clearly governed their relationship. *Id.* at 1341. Here, there is no contract that both SKH and Appellees are signatories to; rather Appellants seek to hold Appellees accountable for services and representations they made to SNC under the Services Contract, which SKH directly benefitted from.

Finally, in *In re Humana*, fewer than all of the doctors had contracts with HMOs that required arbitration, but the doctors in asserting RICO "ma[d]e no suggestion that the contracts containing arbitration clauses are themselves *the product of, or in any way related to, the HMO's conspiratorial behavior.*" 285 F.3d at 976 (emphasis added). Here, the Contracts are "related to" Appellants' allegations and claims. SNC, which controls SKH, entered into the Contracts with Appellees to sell, install, service, and maintain the Power Train Sets at *SKH's Power Plant*. SKH plainly received direct benefits from Appellees. And the very facts Appellants plead, the alleged representations to SKH, and the warranties Appellants sue upon were all made to SNC and then passed onto SKH due to the Services Contract. *See supra* 38-44. Appellants, through their insured, cannot receive the benefits of the Contracts, rely on the Contracts in this lawsuit, and then disavow arbitrating pursuant to those Contracts.

## IV. ALTERNATIVELY, APPELLEES MAY INVOKE THE O&M ARBITRATION PROVISION BETWEEN SKH AND SNC PURSUANT TO THE DOCTRINE OF EQUITABLE ESTOPPEL

If this Court concludes the Contracts between SNC and Appellees do not require this dispute be arbitrated, this Court should still affirm. Appellants are required to arbitrate pursuant to the O&M Arbitration Provision between SKH and SNC. Under the doctrine of equitable estoppel, Appellees (as non-signatories) can enforce the O&M Arbitration Provision and compel Appellants to arbitrate.

> [A] non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of "the relationship among the parties, the contracts they signed … and the issues that had arisen" among them discloses that "the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed."

*Heath*, 2018 WL 4846532, at *3 (quoting *Ragone v. Atl. Video at the Manhattan Ctr.*, 595 F.3d 115, 126–27 (2d Cir. 2010)).

The O&M Contract contains an arbitration agreement, which is nearly identical to the Services Arbitration Provision. *Compare* Dkt. 21-8 §25.3 *with* Dkt. 21-3 §25.2. In fact, the Services Contract and the O&M Contract are substantially similar coordinated agreements.[20] SKH entered the O&M Contract

---

[20] Various provisions of both contracts occur under the same section number and have substantively identical—if not verbatim—wording. *Compare* Dkt. 21-3 *with* Dkt. 21-8.

with SNC to retain SNC to operate and maintain that Power Plant.  Dkt. 21-8 at Preamble.  The O&M Contract empowers SNC to enter into subcontracts for operation and maintenance of that Power Plant, *id.* §26, pursuant to which SNC entered into the Contracts with Appellees for the purchase, installation, and maintenance of the Power Train Sets at SKH's Power Plant.  *See* Dkts. 21-3–21-6.  It is only through the O&M Contract SNC both had any authority with regard to the Power Plant and could enter into the Contracts with Appellees for their services at the Power Plant that are central to this dispute.  *See e.g.* Dkt. 21-3 at Preamble.  As Appellees' conduct complained of in the Amended Complaint could not have arisen—and would not have been performed—but for the O&M Contract (and, derivatively, the Services Contract), Appellants are (also) equitably estopped from avoiding arbitration pursuant to the O&M Contract.

Both *Heath* and *Ragone* are illustrative.  In *Heath* the plaintiff entered into a credit card agreement with a third party, which contained an arbitration provision.  *Heath*, 2018 WL 4846532, at *1.  That third party then contracted out to the defendant for debt collection services.  *Id.*  Plaintiff filed suit against the defendant for violation of the Telephone Consumer Protection Act ("TCPA") (a statutory claim), because the defendant allegedly called plaintiff's cell phone without consent.  The court found equitable estoppel allowed the defendant—a non-signatory to the credit card agreement—to compel arbitration for a claim under the TCPA because

the debt referenced in the complaint, on which defendant called plaintiff's cell phone to collect, was "the outstanding balance on [plaintiff's] account, which is governed by the [arbitration] agreement." *Id.* at *3. Notably, the credit card agreement in *Heath* made no reference to the debt collector or any obligations of the debt collector. *Id.* Yet the court required arbitration because the claim arose from the underlying account balance, *i.e.* the subject matter of the contract. *Id.*

Like in *Heath,* Appellants' statutory and tort claims all arise from the subject matter of the O&M Contract, as that governs SNC's operation and maintenance of the Power Plant and SNC then, like the debt collector in *Heath*, retained Appellees to perform the work.

Similarly, in *Ragone,* the plaintiff Ragone was hired as a make-up artist by AVI, and AVI assigned Ragone to its client (ESPN). *Ragone*, 595 F.3d at 126–27. When Ragone brought suit against ESPN, ESPN moved to compel arbitration under Ragone's employment agreement with AVI. *Id.* at 126. ESPN was neither a signatory to the employment agreement, nor mentioned in the arbitration agreement or any other document related to Ragone's employment. *Id.* Nevertheless, the Second Circuit held Ragone was estopped from denying arbitration with ESPN because of the relationship of the parties and the fact Ragone was, in practical terms, retained to provide services to ESPN. *Id.* at 127-28.

The same structure as in *Ragone* is present here: SKH retained SNC under the O&M Contract to maintain the Power Plant, and SNC subcontracted to Appellees to provide those services to SKH. It is immaterial that the O&M Contract does not explicitly mention Appellees when the entire basis of the dispute stems from the relationship among the parties, and the sole reason Appellees performed services at SKH's Power Plant is due to the O&M Contract and the resulting contracts with SNC.

Additionally, the recent concurring opinion by Judge Tjoflat in *Outokumpu III* is instructive. 2022 WL 2643936, at *4 (Tjoflat, J. concurring). In that case, the plaintiff, Outokumpu, sued GE Energy due to allegedly faulty motors provided by GE Energy for Outokumpu's cold rolling mills. *Outokumpu Stainless USA, LLC v. Converteam SAS*, 902 F.3d 1316, 1321 (11th Cir. 2018) ("*Outokumpu I*"), *rev'd and remanded sub nom. Outokumpu II*, 140 S. Ct. 1637. Outokumpu brought several claims against GE Energy, including for negligence, products liability, and breach of warranty. There was no privity of contract between Outokumpu and GE Energy. *Id.* Rather, Outokumpu had entered into contracts with non-party "Fives," and Fives subcontracted the motors to GE Energy. *Id.* at 1320-21. GE Energy sought to compel arbitration under the agreement between Outokumpu and Fives—the equivalent to the O&M Contract here. *Id.* at 1322.

Following remand from the Supreme Court, this Circuit compelled Outokumpu to arbitrate. *Outokumpu III*, 2022 WL 2643936, at \*3. The majority reached this decision pursuant to contractual language inapplicable here. *Id.* Judge Tjoflat, however, believed the majority opinion did not comply with the Supreme Court's mandate, and his concurrence examined whether Outokumpu was required to arbitrate with non-signatory GE Energy under the doctrine of equitable estoppel. *Id.* at \*4 (Tjoflat, J. concurring). Judge Tjoflat, after finding federal common law governed, concluded Outokumpu was estopped, as Outokumpu "is relying entirely on its contract with Fives to litigate against Fives' subcontractor GE Energy." *Id.* at \*7. The arguments raised by Appellants here mirror those of Outokumpu and rejected by Judge Tjoflat. *See* Supplemental Brief of Appellant, *Outokumpu Stainless USA, LLC v. Coverteam SAS*, No. 17-10944 (11th Cir. Aug. 28, 2020), Dkt. 110 at 37-40 (relying on First Circuit's decision in *Hogan*, and claiming it did not rely on the contract but instead on tort law); *see also* Supplemental Response Brief of Appellee, *Outokumpu Stainless USA, LLC v. Coverteam SAS*, No. 17-10944, (11th Cir. Sept. 11, 2020), Dkt. 117 at 7, 10-12 ("In the absence of those Contracts, there would be no motors, no relationship between Outokumpu and GE Energy, no implied warranties or duty of care running from GE Energy to Outokumpu, and no viable legal claim against GE Energy … Outokumpu's argument boils down to the proposition that equitable estoppel does not apply simply because its Complaint does

not include a claim entitled 'breach of contract.' But that is not the law."). Appellants make the same duty, representation, and warranty allegations here as Outokumpu made, and Judge Tjoflat's concurrence is instructive that estoppel applies.

Appellants' claims depend upon the O&M Contract. The Amended Complaint is entirely premised on SKH's authorization of SNC to operate and maintain the Power Plant under the O&M Contract. It is only through this authority that SNC entered the Contracts with Appellees for the exact conduct about which Appellants now complain. Additionally, Appellants' rely on representations and warranties only made to SNC. *See supra* at 38-44. But Appellants are not subrogees of SNC. In essence, Appellants seek for SKH to step into the shoes of SNC—relying on the alleged conduct between Appellees and SNC. But the only basis Appellants have for asserting a relationship between SKH and SNC is the O&M Contract. Appellants cannot litigate as though all actions Appellees took towards SNC were in effect against SKH because SNC was operating SKH's Power Plant on its behalf, and at the same time disavow reliance on the O&M Contract. By relying on the O&M Contract, Appellants are estopped from avoiding arbitration.

## CONCLUSION

For the foregoing reasons, Appellees respectfully request this Court affirm the

Order of the District Court compelling Appellants arbitrate their dispute, pursuant

either to the Services Contract or the other Contracts and/or the O&M Contract.

This 18th day of December 2023.

Respectfully Submitted,

/s/ *William K Whitner*

William K Whitner
Eric D. Stolze
PAUL HASTINGS LLP
1170 Peachtree Street, N.E.
Suite 100
Atlanta, GA, 30309
Tel: (404) 815-2400
kwhitner@paulhastings.com
ericstolze@paulhastings.com

Kurt W. Hansson
James L. Ferguson
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10165
Tel: (212) 318-6000
Fax: (212) 230-7843
kurthansson@paulhastings.com
jamesferguson@paulhastings.com

Stephen B. Kinnaird
PAUL HASTINGS LLP
2050 M Street, NW
Washington, D.C. 20026
Tel: (202) 551-1700
stephenkinnaird@paulhastings.com

*Attorneys for Appellees General Electric International, Inc., General Electric Company, GE Power Services Engineering, and GE Power*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

Pursuant to Federal Rule of Appellate Procedure 32, I certify the following:

The attached response complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The response has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type style. The brief contains 13,000 words (according to the Microsoft Word count function), excluding items exempted by Federal Rule of Appellate Procedure 32(f).

Dated: December 18, 2023

/s/ *William K Whitner*
William K Whitner
PAUL HASTINGS LLP
1170 Peachtree Street, N.E.
Suite 100
Atlanta, GA, 30309
Tel: (404) 815-2400

*Attorneys for Appellees General Electric International, Inc., General Electric Company, GE Power Services Engineering, and GE Power*